# United States Court of Appeals
## For the First Circuit

No. 10-1449

JERALINE SANTIAGO,
AS NEXT FRIEND OF HER MINOR SON,

Plaintiff, Appellant,

v.

COMMONWEALTH OF PUERTO RICO ET AL.,

Defendants, Appellees.

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Thompson, Selya and Dyk[*], Circuit Judges.

Alfredo Fernández, Carolina Santa Cruz, Elias Correa Menéndez and Delgado & Fernández, LLP on brief for appellant.
Jose R. Olmo-Rodriguez on brief for appellees Cotto and Oyola.
Angel E. Rotger-Sabat and Maymi, Rivera & Rotger, P.S.C. on brief for appellee Commonwealth of Puerto Rico.

August 24, 2011

[*]Of the Federal Circuit, sitting by designation.

**SELYA, Circuit Judge.** This appeal grows out of a lurid allegation that a bus driver assigned to transport special education students to and from a public school sexually abused one of his charges. It presents important questions concerning the parameters of the "under color of state law" requirement of 42 U.S.C. § 1983 and the "actual knowledge" requirement of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688.

After a dizzying array of procedural twists and turns, the district court resolved these questions in favor of the defendants and brought the action to a close. The plaintiff appeals. Although our reasoning differs in certain respects from that of the court below, we affirm.

## I. BACKGROUND

During the fall of 2003, a six-year-old boy, whom we shall call "Jherald," was enrolled at a public school in Bayamón, Puerto Rico.[1] This school is administered by the Commonwealth of Puerto Rico through its Department of Education (the Department). Jherald was born with a profound bilateral hearing impairment and, as required by the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-1482, receives a variety of educational support services free of cost. As part of this mix and as required by the terms of Jherald's individualized education program (IEP),

_____

[1] The appellate briefs refer to the minor by his initials: "J.A.A.S." But the pleadings and the parties' briefs before the district court, none of which are under seal, are more forthcoming.

see id. § 1414(d), the Department, at the times relevant hereto, furnished him with daily transportation to and from school.

The Department receives federal funding to assist it in meeting its responsibilities to students with disabilities who, like Jherald, are under its supervision. It uses these funds, in part, to pay for the transportation of such students. For the 2003-2004 academic year, the Department entered into a contract with Guillermo Cotto and Luz Oyola, the proprietors of a bus company, to furnish services of this nature. In turn, Cotto and Oyola hired the needed drivers, including one Freddy Márquez. Márquez regularly drove the vehicle (owned by the bus company) that transported Jherald to and from school.

On or about October 15, 2003, Jherald appeared visibly nervous when he returned home from school. His mother, plaintiff-appellant Jeraline Santiago, asked him what had happened. Jherald proceeded to describe in disturbing detail the alleged sexual abuse.[2]

The next morning, Jeraline went to the school and told Jherald's teacher about her son's accusation. The teacher referred her to a school social worker. The two spoke but Jeraline,

---

[2] The record contains Jherald's deposition testimony indicating that Márquez had sexually abused him on other occasions. Because these claims do not appear in the complaint and because there is no evidence that any of these supposed assaults were reported prior to the October 2003 incident, they are not material to the issues on appeal.

frustrated by what she perceived as the social worker's failure to take the matter seriously, later tried unsuccessfully to contact the school principal. At some point, Jeraline removed Jherald from the school.

On May 7, 2008, Jeraline sued on behalf of her minor son. Her complaint included a claim under 42 U.S.C. § 1983 against Cotto, Oyola, and their jointly owned bus company (collectively, the private defendants), a Title IX claim against the Commonwealth, and a smorgasbord of claims under local law. From that point forward, the case took a series of unusual twists and turns. We mention only those events that pertain to the issues on appeal.

Following the completion of pretrial discovery, the private defendants moved for summary judgment. The plaintiff opposed the motion, and the district court denied it. At the same time, however, the court ordered the plaintiff to show cause why summary judgment should not be granted on the section 1983 claim. Santiago v. Puerto Rico (Santiago I), No. 08-cv-01533, 2009 WL 3878286, at *3-4 (D.P.R. Nov. 12, 2009). The court also dismissed, sua sponte, the plaintiff's federal claims against the Commonwealth. Id. at *4.

Both the plaintiff and the private defendants sought reconsideration, and the plaintiff served a response to the show-cause order. The district court acted on these submissions as a unit. It concluded that the private defendants were not state

-4-

actors and, therefore, granted summary judgment in their favor on the section 1983 claim. Santiago v. Puerto Rico (Santiago II), No. 08-cv-01533, 2009 WL 4921612, at *2 (D.P.R. Dec. 10, 2009). The court simultaneously reinstated the plaintiff's Title IX claim, expressing a tentative belief that the complaint (by then amended) stated a Title IX claim against the Commonwealth upon which relief could be granted. Id.

This time, it was the Commonwealth that moved for reconsideration. The plaintiff objected, insisting that the Commonwealth should not be allowed to raise new arguments in a reconsideration motion. The plaintiff added that, in all events, the motion should be treated under the standards applicable to motions brought pursuant to Federal Rule of Civil Procedure 12(b)(6) and, so treated, should be denied.

The district court granted the motion to reconsider. It explained that, because it originally dismissed the Title IX claim sua sponte, the Commonwealth had not waived any grounds for dismissal. Santiago v. Puerto Rico (Santiago III), No. 08-cv-01533, 2010 WL 500401, at *1 (D.P.R. Feb. 5, 2010). The court proceeded to evaluate the (previously reinstated) Title IX claim under Rule 12(b)(6) and dismissed it. Id. at *1-2 & n.2. It then dismissed the local law claims without prejudice, see 28 U.S.C. § 1367(c), and entered a final judgment.

This timely appeal ensued. In it, the plaintiff challenges both the order for summary judgment on the section 1983 claim against the private defendants and the order dismissing the Title IX claim against the Commonwealth.

## II. DISCUSSION

We divide our substantive discussion into two parts, corresponding to the plaintiff's dual assignments of error.

### A. Section 1983.

To put the lower court's section 1983 ruling in perspective, we must first iron out a procedural wrinkle. The court's entry of summary judgment on this claim followed a motion to reconsider an earlier order. We normally review a district court's decision to grant or deny a motion for reconsideration for abuse of discretion. See, e.g., Bennett v. Saint-Gobain Corp., 507 F.3d 23, 34 (1st Cir. 2007). Here, however, the parties' arguments were directed to the underlying substantive issue (the propriety vel non of summary judgment) rather than the procedural issue (the desirability vel non of reconsideration). Consequently, the summary judgment standard applies in connection with our review of this ruling. See Ruiz Rivera v. Pfizer Pharm., LLC, 521 F.3d 76, 81-82 & n.6 (1st Cir. 2008).

We review the entry of summary judgment de novo. Foote v. Town of Bedford, 642 F.3d 80, 82 (1st Cir. 2011). In that exercise, we take the facts, along with all reasonable inferences

therefrom, in the light most favorable to the nonmoving party. Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999). We will affirm only if the record, so viewed, discloses that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2).

For this purpose, an issue is "genuine" if the record allows a rational factfinder to resolve it in favor of either party. Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4 (1st Cir. 2010). A fact is "material" only "if its existence or nonexistence has the potential to change the outcome of the suit." Id. at 5.

The legal framework pertaining to a section 1983 claim is well established. "Section 1983 supplies a private right of action against a person who, under color of state law, deprives another of rights secured by the Constitution or by federal law." Redondo-Borges v. U.S. Dep't of HUD, 421 F.3d 1, 7 (1st Cir. 2005) (quoting Evans v. Avery, 100 F.3d 1033, 1036 (1st Cir. 1996)). To make out a viable section 1983 claim, a plaintiff must show both that the conduct complained of transpired under color of state law and that a deprivation of federally secured rights ensued. See id. We focus here on the "under color of state law" requirement.

Section 1983's "under color of state law" requirement is the functional equivalent of the Fourteenth Amendment's "state

-7-

action" requirement. See United States v. Price, 383 U.S. 787, 794 n.7 (1966); Perkins v. Londonderry Basketball Club, 196 F.3d 13, 17 n.1 (1st Cir. 1999). Accordingly, we regard case law dealing with either of these formulations as authoritative with respect to the other, and we use the terminologies interchangeably.

Only the private defendants have been sued under section 1983. If their conduct cannot be classified as state action, the claim against them must fail.[3] See Rendell-Baker v. Kohn, 457 U.S. 830, 838 (1982).

Cotto, Oyola, and the company that they own are without question private parties. The mere fact that they entered into a contract with the Department to transport public school students does not alter their status. See id. at 840-41. In some circumstances, however, the conduct of private parties may be "fairly attributable to the State," Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982), and therefore may constitute action under color of state law.

The Supreme Court has observed that "[o]nly by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." Burton v. Wilmington Parking Auth., 365 U.S. 715, 722 (1961).

---

[3] Because the plaintiff's section 1983 claim is directed exclusively against the private defendants, we find unhelpful her citation to case law evaluating whether there exists a "special custodial relationship" between the state and an individual who is subjected to a violation of rights.

Consistent with this fact-specific approach, this court has identified three ways in which a private entity may be deemed a state actor. A private party may become a state actor if he assumes a traditional public function when performing the challenged conduct; or if the challenged conduct is coerced or significantly encouraged by the state; or if the state has "so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in [the challenged activity]." Estades-Negroni v. CPC Hosp. San Juan Capestrano, 412 F.3d 1, 5 (1st Cir. 2005) (alterations in original); see Alberto San, Inc. v. Consejo de Titulares del Condominio San Alberto, 522 F.3d 1, 4 (1st Cir. 2008). If the facts, viewed most hospitably to the plaintiff, make out a jury question as to any one of these alternatives — the public function test, the state compulsion test, or the nexus/joint action test — the "under color of state law" requirement is satisfied for summary judgment purposes.

The plaintiff's "state action" argument spans all three of these avenues. Her main emphasis, however, is on the public function test. She posits that the private defendants assumed a traditional state responsibility by providing home-to-school-to-home transportation for public school students with disabilities. We do not agree.

For purposes of section 1983, Puerto Rico is the functional equivalent of a state. See Martinez v. Colon, 54 F.3d

-9-

980, 984 (1st Cir. 1995). Under the public function test, state action inheres "in the exercise by a private entity of powers traditionally exclusively reserved to the State." Jackson v. Metro. Edison Co., 419 U.S. 345, 352 (1974) (emphasis supplied). Exclusivity is an important qualifier, and its presence severely limits the range of eligible activities. See Rendell-Baker, 457 U.S. at 842 ("That a private entity performs a function which serves the public does not make its acts state action."). The narrowness of this range is no accident. The public function test has a specific, targeted purpose: it is meant to counteract a state's efforts to evade responsibility by delegating core functions to private parties. Perkins, 196 F.3d at 18-19.

Not surprisingly, the activities that have been held to fall within the state's exclusive preserve for purposes of the public function test are few and far between. They include "the administration of elections, the operation of a company town, eminent domain, peremptory challenges in jury selection, and, in at least limited circumstances, the operation of a municipal park." Id. at 19 (quoting United Auto Workers v. Gaston Festivals, Inc., 43 F.3d 902, 907 (4th Cir. 1995)). These activities are characterized by exclusivity born of pervasive government involvement, and that multi-dimensional characteristic informs the whole of the public function category.

We find particularly instructive the Supreme Court's opinion in <u>Rendell-Baker</u>. Confronted with a situation analogous to the one here, the Court held that a private institution paid by a state to educate maladjusted high school students was not a state actor. 457 U.S. at 842. In reaching this conclusion, the Court noted that the state had only recently begun providing education for students who could not be served by traditional public schools, and therefore alternative education was not historically within the exclusive purview of the state. We have taken this reasoning to its logical conclusion and determined that education in general is not an exclusive public function because it has long been undertaken by private institutions. <u>See</u>, <u>e.g.</u>, <u>Logiodice</u> v. <u>Trs. of Me. Cent. Inst.</u>, 296 F.3d 22, 26-27 (1st Cir. 2002).

Viewed in this light, the plaintiff's argument falters. If the education of children does not itself fall within the narrow range of exclusive state functions, it is hard to imagine how a service ancillary to education, such as the transportation of students, would qualify. <u>Cf.</u> <u>Perkins</u>, 196 F.3d at 19 (making similar observation with respect to organization of youth sports). As every school child knows, the greater includes the lesser.[4]

_____

[4] Although we reaffirm that providing schooling is not an exclusively public function, our opinion should not be read as equating contracting out school operation itself with contracting out school busing for state action purposes. Contracting out school operation itself could, in certain circumstances, create difficult state action issues, <u>see</u> <u>Logiodice</u>, 296 F.3d at 29-30, particularly if the contract is a sham arrangement designed to

-11-

We are not the first court to reach the conclusion that transportation to and from school is not an exclusive state function. Considering strikingly similar facts, the Third Circuit found that a private bus company and its employees were not subject to liability under section 1983 even though, by transporting pupils to and from public schools, they "were carrying out a state program at state expense." Black ex rel. Black v. Ind. Area Sch. Dist., 985 F.2d 707, 710-11 (3d Cir. 1993). The private defendants were not state actors, the court wrote, because "they were not performing a function that has been 'traditionally the exclusive prerogative of the state.'" Id. at 711.

The plaintiff labors to distinguish Black on the ground that it involved "regular" public school students, not special education students who have a statutory entitlement under the IDEA to receive supplemental education-related services.[5] This argument seemingly derives from the Supreme Court's decision in West v. Atkins, 487 U.S. 42 (1988). There, the Court determined that a private physician, retained by the state to provide medical care to prison inmates, was a state actor. Id. at 54-57. This determination rested largely on the premise that, by incarcerating

_____

allow the state to avoid its constitutional duties, see Rendell-Baker, 457 U.S. at 842 n.7.

[5] This argument is necessarily a statutory one, as the Supreme Court has rejected any notion that the Constitution requires a state to provide public education. See San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 35 (1973).

-12-

prisoners, the state (which was obligated to provide them with medical care) had curbed the prisoners' ability to seek care elsewhere. Id. at 55. The state's foreclosure of other options grounded the necessary finding of exclusivity.

The distinction etched by the plaintiff makes no difference. The relevant inquiry looks to the nature of the service provided, not its beneficiary. Just as education is not exclusively a state function because it is regularly performed by private entities, see Logiodice, 296 F.3d at 26-27, so too student transportation falls outside the exclusive purview of the state. Indeed, it is widely believed that the first school bus was commissioned by a private Quaker school, and today nearly half of all K-12 students are transported to school at private expense, see P. Teske et al., Drivers of Choice: Parents, Transportation, and School Choice, at 9 (2009).

We note, moreover, that even if Jherald had a statutory right to round-trip school transportation, the state did not preclude him from choosing another means of traveling to school. This case is thus distinguishable from West, where the state closed off all avenues for a prisoner to exercise his right to medical care other than through a doctor retained by the state. Here, by contrast, Jherald's mother had several options for transporting her son to school. She could, for example, have driven him to school, participated in a car pool, or used public transportation. This

-13-

freedom to choose alternatives removes school busing from the realm of services that are traditionally exclusively reserved to the state. See Black, 985 F.2d at 714.

As a fallback, the plaintiff attempts to navigate both of the other routes by which a private party can be transmogrified into a state actor. We briefly explain why, on the facts at hand, neither route leads her to the promised land.

First, the plaintiff's contention that the private defendants "functioned within the Commonwealth's system of federal compliance" constitutes an attempt to trigger the state compulsion test. But to establish state action under that test, a plaintiff must demonstrate a particularly close tie between the state and the private party's conduct, such that the conduct may fairly be regarded as state action. Jackson, 419 U.S. at 351. "This inquiry is a targeted one, with the challenged conduct at the hub of the analytical wheel." Perkins, 196 F.3d at 19. Even the rights-depriving conduct of an extensively regulated private party does not amount to action under color of state law unless the conduct itself is compelled (or, at least, heavily influenced) by a state regulation. See Blum v. Yaretsky, 457 U.S. 991, 1004-05 (1982); Rendell-Baker, 457 U.S. at 840-41.

Here, the rights-depriving conduct is Márquez's alleged molestation coupled with the bus company's failure properly to screen and train its employees. No state regulation compelled (or

even encouraged) either Márquez's or the bus company's actions. The state compulsion test requires more than the taking of action against a backdrop of applicable state regulations. Because there is no showing that the Commonwealth exercised coercive power over or significantly encouraged either the abuse to which Jherald was allegedly subjected or the bus company's failure properly to screen and train its employees, the state compulsion test is not satisfied. See Estades-Negroni, 412 F.3d at 5.

The plaintiff's effort to embrace the third state action theory fares no better. To pass this test, a plaintiff must show that the private party's actions are attributable to the state through a symbiotic relationship[6] between the two. See id. at 6. The requisite nexus is premised on a showing of mutual interdependence. See Burton, 365 U.S. at 723-25; Ponce v. Basketball Fed'n of P.R., 760 F.2d 375, 381 (1st Cir. 1985). The "most salient" factor in this determination "is the extent to which the private entity is (or is not) independent in the conduct of its day-to-day affairs." Perkins, 196 F.3d at 21. A private party's use of public facilities may weigh in the balance. See Burton, 365 U.S. at 723. So, too, may the state's sharing of profits generated from the private party's rights-depriving conduct. See Barrios-

_____

[6] Our cases sometimes refer to the "nexus/joint action test" as the "symbiotic relationship test." See, e.g., Perkins, 196 F.3d at 18. Whatever the nomenclature, the test remains the same.

Velázquez v. Asociacion de Empleados del Estado Libre Asociado, 84 F.3d 487, 494 (1st Cir. 1996).

In advancing her nexus/joint action theory, the plaintiff stresses that the IDEA requires that the Commonwealth retain ultimate responsibility for the provision of education and ancillary services to students with disabilities. That is true as far as it goes, see, e.g., 20 U.S.C. § 1400(c)(6), but it does not take the plaintiff very far. There is nothing in the record to indicate that this retained responsibility caused the Commonwealth to insinuate itself into the day-to-day operations of the bus company. The record is equally barren of any indication that the private defendants enjoyed special access to public facilities, used publicly owned equipment, or shared profits earned under the transportation contract with the Commonwealth. For aught that appears, the relationship between the private defendants and the Commonwealth was merely that of contracting parties operating at arm's length. On this record, it cannot plausibly be said that the private defendants and the Commonwealth were so entangled as to render the private defendants state actors.

In a final foray that interweaves doctrinal strands, the plaintiff dwells upon the Department's payment of federal funds to the private defendants. But this linkage will not support the weight that the plaintiff places on it. A private party cannot be transformed into a state actor simply because it is paid with

government funds for providing a service. See Rendell-Baker, 457 U.S. at 840-41; Black, 985 F.2d at 710.

That ends this aspect of the matter. Because no rational factfinder could conclude that the private defendants acted under color of state law, we uphold the district court's entry of summary judgment on the section 1983 claim.[7]

## B. **Title IX**.

We turn now to the plaintiff's Title IX claim against the Commonwealth. The district court initially dismissed this claim sua sponte. By its very nature, a sua sponte dismissal engenders especially rigorous appellate review. See Chute v. Walker, 281 F.3d 314, 319 (1st Cir. 2002); González-González v. United States, 257 F.3d 31, 36-37 (1st Cir. 2001). Here, however, the district court revisited the matter, reinstated the Title IX claim, and agreed to reconsider it. See Santiago II, 2009 WL 4921612, at *2. It was only upon reconsideration, after briefing and argument, that the court brought the matter full circle and again dismissed the claim. See Santiago III, 2010 WL 500401, at *1-2.

This irregular sequence of events makes it pellucid that the plaintiff had a full and fair opportunity to muster her arguments in opposition to dismissal and present them to the court.

---

[7] Given the absence of any action under color of state law by the private defendants, see text supra, we do not need to reach the question of whether the plaintiff has adequately alleged the second element of a section 1983 claim.

-17-

Consequently, we see no unfairness in reviewing the ensuing order as a conventional dismissal for failure to state a claim. Indeed, this is the very mode of review that the plaintiff has sought.

We review de novo an order granting or denying a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. Artuso v. Vertex Pharm., Inc., 637 F.3d 1, 5 (1st Cir. 2011). In conducting that review, we accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor. SEC v. Tambone, 597 F.3d 436, 441 (1st Cir. 2010) (en banc). "We are not wedded to the lower court's rationale, but may affirm the order of dismissal on any ground made manifest by the record." Román-Cancel v. United States, 613 F.3d 37, 41 (1st Cir. 2010).

As a general matter — there are exceptions not relevant here — a complaint must contain no more than "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). It need not set out "detailed factual allegations." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). But gauzy generalities will not suffice; "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

-18-

inference that the defendant is liable for the misconduct alleged."
Id. "If the factual allegations in the complaint are too meager,
vague, or conclusory to remove the possibility of relief from the
realm of mere conjecture, the complaint is open to dismissal."
Tambone, 597 F.3d at 442.

Against this mise-en-scène, we repair to Title IX. The
statute provides in pertinent part that "[n]o person . . . shall,
on the basis of sex, be excluded from participation in, be denied
the benefits of, or be subjected to discrimination under any
education program or activity receiving Federal financial
assistance." 20 U.S.C. § 1681(a). It expressly confers an
administrative means of enforcement, see id. § 1682, and impliedly
confers a private right of action, see Gebser v. Lago Vista Indep.
Sch. Dist., 524 U.S. 274, 283-84 (1998). This implied private
right of action allows an aggrieved party to seek money damages
against an educational institution[8] that receives federal funds but
not against individuals who merely work for such an institution.
Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 65 (1st Cir. 2002).

---

[8] The proper institutional defendant here is the Department,
which receives federal funds to help provide education-related
services to students with disabilities. See, e.g., Davis ex rel.
LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 641 (1999).
The parties disagree about whether the plaintiff has sued the
Department as opposed to the Commonwealth. Because the Title IX
claim fails on other grounds, we assume arguendo that the plaintiff
has joined the proper defendant.

-19-

Two types of harassment are actionable under Title IX: quid pro quo harassment and hostile environment harassment. Id. Because quid pro quo harassment is not implicated here, we limit our discussion to hostile environment harassment.

In general, a hostile environment claim under Title IX requires acts of sexual harassment that are so severe and pervasive as to interfere with the educational opportunities normally available to students. Id. To limn such a claim, the plaintiff must identify "a cognizable basis for institutional liability." Id. at 66. This necessitates a showing that a federal funding recipient acted with deliberate indifference toward known acts of harassment occurring in its programs or activities. Davis ex. rel LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 641-43 (1999); Gebser, 524 U.S. at 290-91.

The deliberate indifference standard has considerable bite. It demands that a funding recipient be shown to have had actual knowledge of the harassment. Davis, 526 U.S. at 642; Wills v. Brown Univ., 184 F.3d 20, 26 (1st Cir. 1999). This stringent requirement applies to Title IX claims "to eliminate any 'risk that the recipient would be liable in damages not for its own official decision but instead for its employees' independent actions.'" Davis, 526 U.S. at 643 (quoting Gebser, 524 U.S. at 290-91).

The Supreme Court has held that federal funding recipients may be liable under Title IX for acts of student-on-

student and teacher-on-student harassment.  See id.; Gebser, 524 U.S. at 281.  But "[a] recipient cannot be directly liable for its indifference where it lacks the authority to take remedial action." Davis, 526 U.S. at 644.  The lines of institutional authority vis-à-vis an employee of a third-party contractor are often blurred. Everything depends on "the recipient's degree of control over the harasser and the environment in which the harassment occurs."  Id.

Whatever the context, Title IX's "actual knowledge" requirement demands that the official who is informed of the alleged harassment be a person who, at a minimum, has the authority to institute corrective measures.  Gebser, 524 U.S. at 290.  A school principal may, in at least some instances, be considered an appropriate person for the receipt of such notice.  See, e.g., id. at 291; Plamp v. Mitchell Sch. Dist. No. 17-2, 565 F.3d 450, 457 (8th Cir. 2009).  But where, as here, the alleged harasser is not a person subject to the principal's customary disciplinary authority, the principal may not qualify as an appropriate person. See Bostic v. Smyrna Sch. Dist., 418 F.3d 355, 361-62 (3d Cir. 2005) (acknowledging that whether principal is "appropriate person" requires factual inquiry into her authority to address the particular harassment at issue).  While it is uncertain what authority a school principal may have over the employee of an outside vendor, it is clear that a lesser functionary within the school (say, a teacher or social worker) does not have the

-21-

authority to order the taking of corrective measures.  Cf. Plamp, 565 F.3d at 457-58 (holding that similarly situated school functionaries lacked proper authority vis-à-vis teacher); Warren ex rel. Good v. Reading Sch. Dist., 278 F.3d 163, 173-74 (3d Cir. 2002) (similar).

Here, the alleged harasser is a bus driver employed by a private company engaged pursuant to a contract with the Department. The plaintiff has not alleged that the principal (or, for that matter, any other school employee) had the authority to take corrective action against the bus driver on the Department's behalf.  Nor can such authority reasonably be inferred from the facts alleged.  This defect alone is fatal to the plaintiff's Title IX claim.  See Plamp, 565 F.3d at 458 n.2 (explaining that the burden is on the plaintiff to establish identity of "appropriate person").

Moreover, even if we were to assume that the principal was an "appropriate person" with the authority to take disciplinary action against the bus driver, the plaintiff has failed to assert that the principal actually knew about the alleged harassment and exhibited deliberate indifference toward it.  The operative pleading is the plaintiff's amended complaint.  We set out below the only allegations in the complaint that are even arguably relevant to the "actual knowledge" inquiry.

The complaint alleges that the plaintiff went to the school on October 16, 2003, and told her son's special education teacher that Jherald had been molested by his bus driver; that the teacher referred her to the school social worker; that the plaintiff visited the social worker, who "did not do anything;" and that the plaintiff "attempted to meet [on] various occasions with the Principal," who "was never available and/or refused to meet with her." Based on these "facts," the complaint asserts that the principal "demonstrated deliberate indifference by failing to take appropriate action when he had knowledge that the abuse was occurring."

This conclusory allegation fails. The complaint contains no facts to make plausible the bald assertion that the principal "had knowledge" of the abuse. It merely explains that the plaintiff tried to contact the principal but was unable to do so. It does not allege actual (as opposed to constructive) knowledge, and it does not suggest, even obliquely, how the principal might have acquired actual knowledge. Furthermore, the allegation that the social worker "did not do anything" undercuts any inference that she reported the abuse to the principal. The irresistible conclusion is that the complaint, fairly read, indicates that the principal lacked actual knowledge of the plaintiff's concerns.

These shortcomings are dispositive. The complaint is bereft of any indication that any other individual authorized to

-23-

take corrective measures had actual knowledge of the bus driver's behavior. Although it mentions Jherald's teacher and the school social worker, the complaint contains nothing that suggests that either of them comes within Title IX's "appropriate person" taxonomy. The empty allegation that a school employee "failed to report" harassment to someone higher up in the chain of command who could have taken corrective action is not enough to establish institutional liability. See id. at 458. Title IX does not sweep so broadly as to permit a suit for harm-inducing conduct that was not brought to the attention of someone with authority to stop it.

On appeal, the plaintiff attempts to shift the focus of the Title IX argument, declaring that "the Commonwealth exercised substantial control over both the harasser and the context in which the known harassment occurred." But even if we assume the truth of this declaration, the existence of such control is not sufficient to rescue the plaintiff's claim. The missing ingredient is whether an appropriate person had actual knowledge of the suspected harassment, not whether the funding recipient had control, in a general sense, of the service provided and the environment in which the harassment occurred. See Gebser, 524 U.S. at 290-91.

## III. CONCLUSION

We hold that the district court supportably determined that the private defendants were not state actors and, thus, were entitled to summary judgment on the section 1983 claim. Further,

-24-

we hold that the plaintiff failed to plead facts sufficient to support a plausible Title IX claim against the Commonwealth and/or the Department; therefore, the court below did not err in dismissing that claim under Rule 12(b)(6).

We close by noting that the plaintiff is not without a remedy. The district court appropriately dismissed her local law claims without prejudice, and she is free to pursue those claims in the courts of Puerto Rico. For our part, we need go no further.

**Affirmed**.